Eulogio Dimas y Josefina Dolores Riera y Bengoechea, ambos por sí; y los menores Alfonso Rafael, Luz María, Antonio, Lucía Mercedes y Rafael Angel Riera y Bengoechea, representados por su legítima madre con patria potestad Doña Josefa Bengoechea y Macías, demandantes y apelados, *v.* El Banco Territorial y Agrícola de Puerto Rico; y Don Olegario Riera Cifuentes, demandados y apelantes.

Nos. 4795 y 5038.—*Sometidos:* Abril 15, 1930. *Resueltos:* Julio 8, 1931.

*C. Coll Cuchí, J. de Guzmán Benítez* y *J. Sifre Jr.,* abogados de los apelantes; *Pellón & Ayuso,* abogados de los apelados.

El Juez Presidente Señor del Toro, emitió la opinión del tribunal.

Estas dos apelaciones se han tramitado separadamente, pero serán consideradas en una sola opinión. Se interpusieron en el mismo pleito, la primera contra la sentencia y la segunda contra la resolución negando un nuevo juicio. Las vistas de los recursos se celebraron el mismo día.

A la fecha de la interposición de la demanda,—noviembre 23, 1926—, todos los siete demandantes eran menores de edad, hallándose dos de ellos, Eulogio y Josefina, emancipados. Los cinco restantes comparecieron representados por su

madre con patria potestad Josefina Bengoechea y Macías. El padre, José Dimas Riera y Cifuentes, falleció súbitamente, a virtud de un accidente de automóvil, el 6 de mayo de 1920, siendo los demandantes declarados sus herederos ab-intestato.

Son los demandados el Banco Territorial y Agrícola de Puerto Rico, una institución de crédito de la Isla, que tenía instalada una sucursal en la República de Santo Domingo, y Olegario Riera y Cifuentes, un ciudadano español, residente en la Península.

La acción ejercitada se titula sobre devolución de bienes e indemnización de perjuicios y se funda, en resumen, en los siguientes hechos:

3. Que en la partición de bienes de José Dimas Riera y Cifuentes, se adjudicó a los demandantes un crédito por $106,681.42 contra la Central Bocachica de Santo Domingo, en bonos hipotecarios de la misma central, dándoseles para ellos cuatrocientos bonos de un valor a la par de quinientos dólares cada uno, fueron recibidos por representación de los demandantes.

4. Que siendo menores los demandantes y existiendo intereses encontrados entre la madre y los hijos, actuó como su defensor en la referida partición, el demandado Olegario Riera y Cifuentes, quien tuvo completo conocimiento de las adjudicaciones, entre ellas de la referida en el párrafo anterior.

5. Que el demandado Olegario Riera, que era en el 11 de septiembre de 1920, y después, Tesorero de la Central Boca Chica, de acuerdo y en combinación con el otro demandado Banco Territorial, que en aquella fecha era acreedor de Boca Chica, pidió al representante de los demandantes los cuatrocientos bonos con el pretexto de canjearlos por otros de nueva emisión, y el único objeto, no referido a los demandantes ni a su representante, de constituir con ellos una garantía de la deuda de la central para con el banco, sucursal de Santo

Domingo, en cuya deuda no tenían participación ni respon-sabilidad los demandantes.

6. Que a virtud de la combinación entre los demandados, el representante de los demandantes entregó, el 11 de septiembre de 1920, al banco los bonos de que eran dueños los demandantes, con el propósito y en la creencia de que iban a canjearse por otros, recibiéndolos el banco y enviándolos a su sucursal de Santo Domingo, y allí, puestos de acuerdo los demandados, dispusieron de ellos sin el consentimiento de los demandantes, ni de su representante legal y sin que mediara autorización judicial. Que así el banco demandado se quedó con los bonos sin que jamás les fueran vendidos por los demandantes, ni consintieran éstos en operación alguna realizada con ellos, negándose los demandados a atender las reclamaciones de los demandantes, viéndose así éstos despojados de sus referidos bienes.

7. Que según información y creencia de los demandantes los bonos fueron entregados por Olegario Riera como garantía colateral de una deuda de la Central Boca Chica para con el banco, sin que los demandantes jamás autorizaran tal entrega ni se convirtieran en fiadores de Olegario Riera o de la Central Boca Chica para con el referido Banco Territorial y Agrícola de Puerto Rico.

Termina la demanda pidiendo que se condene a los demandados solidariamente a devolver a los demandantes los cuatrocientos bonos de quinientos dólares cada uno en cuestión y si la devolución no fuere posible a pagarles el importe de los mismos con sus intereses legales y las costas.

Los demandados formularon separadamente excepciones previas que fueron declaradas sin lugar y contestaron, en resumen, así:

El banco, negando los hechos 3, 4, 5 y 7, y negando también el 6 y afirmando en su lugar que el representante de los demandantes, espontáneamente y sin requerimiento de su parte, le entregó cierta cantidad de bonos de la Central Boca

Chica para remitirlos a dicha central por conducto de su Agencia en Santo Domingo como así lo hizo.

Y Riera, admitiendo el hecho 3 solamente en cuanto dice que en la partición se adjudicó a los demandantes un crédito por $106,681.42 contra la Central Boca Chica, y negando lo demás; admitiendo el hecho 4 en cuanto afirma que el demandado representó en la partición a los menores como defensor y negando lo demás especialmente en cuanto a la adjudicación a los menores de bonos de la central, y negando los hechos 5, 6 y 7.

Fué el pleito a juicio. Los demandantes presentaron como prueba documental actas de matrimonio, nacimientos y defunción, una declaratoria de herederos, el acta de protocolización de las operaciones particionales de la herencia de José D. Riera y Cifuentes en estos dos particulares:

"Inventario: No. 41. Ciento seis mil seiscientos ochenta y un dólares con cuarenta y dos centavos contra la Central Boca Chica de Santo Domingo, en Bonos Hipotecarios garantizados con toda la propiedad inmueble y sus accesorios en la misma pertenecientes a dicha entidad Central Boca Chica domiciliada en Andrés Común de Guerra, Provincia de Santo Domingo, R. D._____$106,681.42.

"Adjudicación: El crédito de ciento seis mil seiscientos ochenta y un dólares con cuarenta y dos centavos contra la Central Boca Chica de Santo Domingo, por cuenta de bonos hipotecarios de la expresada compañía, a que se refiere el número 41 del inventario, su valor_____$106,681.42";

un recibo que dice:

"BANCO TERRITORIAL Y AGRÍCOLA DE PUERTO RICO.—Hemos recibido de Sucesión de José D. Riera la cantidad de cuatrocientos Bonos de quinientos dollars cada uno de la Cent. Boca Chica para ser enviados n/ Ag. Sto. Domingo como parte de la Garantía Colateral del préstamo Agrícola con la citada Agencia. San Juan, Puerto Rico, de 11 de set. 1920. (fdo) A. Frasqueri, cajero";

cartas del demandado Olegario Riera a su hermano el causante de los demandantes; un giro de la Central Boca Chica a favor del Banco Territorial contra José D. Riera, aceptado

y pagado por éste el 9 de marzo de 1920, una certificación relativa al procedimiento seguido en Santo Domingo sobre venta y adjudicación de la Central Boca Chica, y copias de varios acuerdos del Consejo de Administración del Banco Territorial, uno de 12 de julio de 1919 con asistencia del Consejero José D. Riera tomando en consideración para resolverla en la próxima sesión una petición verbal de la Central Boca Chica de un préstamo de refacción agrícola por cien mil dólares; otro de 14 de julio de 1919 también con asistencia del consejero Riera, aprobando un préstamo de refacción agrícola de doscientos mil dólares a la Central Boca Chica con la garantía de . . . . . doscientos cincuenta mil dólares en bonos hipotecarios de la misma central; otro de 4 de septiembre de 1919, concurriendo el consejero Riera, ratificando el acuerdo de 14 de julio, prescindiendo de la garantía de las cañas y reduciendo la garantía de los bonos a doscientos mil dólares; otro de 9 de octubre de 1920, cuando ya había muerto el consejero Riera, autorizando a la agencia de Santo Domingo a formalizar con la Central Boca Chica un préstamo refaccionario por doscientos cincuenta mil dólares con la garantía de sus propios bonos hipotecarios por un valor a la par, y otro de 30 de agosto de 1920 cuyo particular número 6, dice:

"6. A la carta de fecha veinte y tres del corriente de la agencia de Santo Domingo, R. D., contestarla que se accede a lo solicitado por la 'Central Boca Chica' de ampliarla 'hasta la suma de doscientos setenta y cinco mil dólares' el préstamo que se le ha concedido en la sesión del Consejo de nueve del actual, 'a condición de que debe prestar como garantía trescientos mil dólares o más' de sus propios bonos hipotecarios.".

Y como prueba testifical introdujeron los demandantes las declaraciones de Alberto Frasqueri, Antonio Macías y Primitivo Rocafort. Frasqueri, cajero del Banco, reconoció el recibo de que se deja hecho mérito, y dijo que los bonos le fueron entregados por una persona que no recuerda a nombre de la Sucesión Riera para ser enviados a la Agencia

de Santo Domingo, y Rocafort, Secretario del Banco, autenticó las actas a que ya nos hemos referido. Fué Macías el testigo principal. Su declaración se extiende desde la página 9 a la 59 de la primera pieza del recurso No. 4795.

Hemos leído y analizado cuidadosamente línea por línea esa declaración. Procuraremos resumirla en la forma más completa que podamos.

El testigo conoce a los demandantes. Son sus sobrinos. Tiene 41 años y estuvo trabajando con José D. Riera desde los 21, "y en todos sus negocios yo era el que tomaba participación," . . . . . "aunque no tenía un poder escrito, sino verbal, era el que hacía todas las cosas." Estaba en Colombia en negocios de Riera cuando éste murió. Fué llamado por su hermana y por Fabián para hacerse cargo de la oficina de Riera. Su hermana le extendió un poder. "Cuando yo llegué de Colombia don Rafael Fabián pidió a mi hermana las llaves de la oficina para hacer una anotación de los documentos que había en ella y llevaron a la oficina a Eulogio Riera que entonces tenía 13 o 14 años, a Honorato Andrés y a Tomás Lamela; hicieron un inventario de los papeles del Sr. Riera y entre ellos pusieron—bonos de la Central Boca Chica de Santo Domingo—y entonces yo procedí a hacer el inventario y encontré en la caja los bonos hipotecarios de la Central Boca Chica . . . . . cuatrocientos bonos . . . . . Valor a la par de quinientos dólares cada uno." Sabía que Riera tenía esos bonos "porque se los había dado la Central Boca Chica en hipoteca que constituyera a favor de él."

Sabe que el Banco Territorial no tenía que ver nada con los bonos. La Sucesión no tenía negocio alguno con el banco. El testigo tiene los papeles de la Sucesión desde que murió Riera. Los bonos no tenían indicación de estar pignorados. Olegario Riera intervino en la testamentaría como defensor de los menores. "En la adjudicación a los menores, se le adjudicaron los bonos a ellos como garantía."

Los bonos fueron a parar a manos del Banco Territorial.

Al contestar a la pregunta: ¿Cómo fué eso? y al referirse a cierta carta que según él le había dirigido el demandado Olegario Riera, se opuso la parte demandada a que dijera lo que la carta decía. Contestó que no tenía la carta en su poder por haberla remitido a Honorato Andrés a España con motivo de una reclamación contra Riera y no habérsela devuelto. Y continuó declarando: "En el mes de septiembre en 1920, estaba el señor Olegario Riera en San Juan y volvió a repetirme lo que me decía en su carta." Interviene el juez y sigue luego el testigo contestando a la parte demandante, así:

"Juez: ¿Ud. dice que recibió una carta de Olegario Riera?

"R. Sí, señor.

"Juez: En virtud de esa carta, Ud. hizo algo o no? ¿Ud. hizo lo que decía la carta esa o no lo hizo?

"R. No, porque eso fué más . . .

"P. ¿Quiere decir que Ud. recibió la carta en la cual le daba ciertas instrucciones, pero Ud. no las realizó?

"R. No se habían realizado todavía, y en el mes de septiembre de 1920 vino Olegario Riera, a fines de agosto o principios de septiembre, que él estaba aquí en San Juan . . .

"P. ¿Qué pasó con él?

"R. Que me informó que los bonos que yo tenía, en cualquier oportunidad los entregara o bien al señor Mutiu o bien al Banco Territorial y Agrícola, porque iban a ser cambiados por otros, porque ya aquéllos estaban vencidos.

"P. ¿Quién dijo Ud. . . ?

"R. Mutiu, que era el Capitán del vapor Santo Domingo, era una persona de confianza de la Central y al mismo tiempo, era uno de los colonos.

"P. ¿Pero qué fué lo que le dijo Riera a Ud. personalmente?

"R. Que le entregara los bonos.

"P. ¿A quién?

"R. Al Banco Territorial y Agrícola o a otra persona de confianza porque iban a ser sustituídos por otros de nueva emisión, porque ya esos bonos estaban vencidos y podían ser ejecutados en cualquier momento.

"P. ¿Qué hizo Ud.?

"R. Entonces el 11 de septiembre entregué yo personalmente al señor Frasqueri los referidos cuatrocientos bonos.

"P. ¿El once de septiembre de qué año?'

"R. Del 1920, personalmente al señor Frasqueri.

**"P. ¿Se le dió a Ud. algún documento?**

"R. Exigí un recibo y me dió un recibo, donde hacía constar que era para enviarlos a su agencia o sucursal en Santo Domingo para garantizar.

"Ddo. Hay un recibo presentado ya.,

"Juez: No diga el contenido del recibo."

Reconoce el recibo que es el introducido como prueba.

Sigue interrogándose al testigo a los efectos de presentar las cartas de Olegario Riera a José D. Riera, la primera, de mayo 6, 1919, "en cuanto a un párrafo que dice: 'Aun no se ha hecho la escritura hipotecaria, porque para eso esperamos vean el acta y la conformidad tuya y de don Rafael Fabián, para aparecer como prestamistas de la compañía. Entonces se dirá que ya está convenido el préstamo en las condiciones que el acta indica. La redacción del bono hipotecario, ya estaba hecho y en lugar de ser los vencimientos anuales, el día primero de septiembre como decías, hemos determinado que el primer vencimiento de $70,000 sea el día 1 de julio de 1920 y los demás en la misma fecha de los años subsiguientes. De esta manera los cupones que representarán el interés, vencerán trimestralmente el 30 de septiembre, el 31 de diciembre, 31 de marzo y 30 de junio. Por otra parte se podrá hacer cualquier operación más pronto' '', la segunda de agosto 14, 1919, en cuanto a la indicación que contiene en su último párrafo "de que se están haciendo los bonos," y la tercera de 13 de noviembre, 1920, "para probar que en esa fecha estaba actuando Olegario Riera como tesorero de la Central Boca Chica." Las cartas fueron admitidas con la oposición y excepción de la parte demandada.

Reconoció el testigo otra carta de Olegario Riera dirigida a la Sucesión Riera que se introdujo como prueba también

para demostrar que Olegario era el tesorero de la central y un giro de la central contra Riera y a favor del Banco por $25,000. Se admitieron esos documentos de igual modo con la objeción y excepción de los demandados.

Siguió declarando el testigo que para entregar los bonos no se pidió autorización judicial, sin que se hayan devuelto ni los bonos, ni su importe, y agregó: "Según tengo entendido el Banco Territorial y Agrícola ejecutó con ellos a la Central Boca Chica de Santo Domingo." Reconoce la copia de los procedimientos de ejecución que se introducen y admiten como prueba con la oposición y excepción de los demandados.

Desde que murió Riera ha sido apoderado y gestor de la Sucesión y está seguro de que no se pidió autorización judicial para la entrega de los bonos. Termina aquí el interrogatorio directo. Continúa el testigo contestando a la parte demandada.

Ratifica que estuvo trabajando con Riera veinte años. Riera fué un tiempo Vice-Presidente de la Central Boca Chica. Luego prestó dinero a la central. No recuerda si fué Presidente de la central; no recuerda si cuando murió desempeñaba algún puesto en la Junta Directiva de la Central. "Estaba empapado de los negocios, pero no de los cargos."

A la pregunta ¿cómo fué que Riera adquirió esos cuatrocientos bonos? contestó: "Eran de él." Y continuó el interrogatorio textualmente, así:

"P. ¿Cómo los adquirió? ¿Qué negocio hizo?
"R. No sé qué negocio hizo con la Central; la Central se los daba en garantía por dinero que él le prestaba.
"P. ¿Pero el negocio que dió origen a eso?
"R. Como ya dije, no sé qué negocio hizo él con la Central.
"P. ¿Pero cómo Ud. ha dicho que estaba enterado de los negocios de José D. Riera me parece que yo estaba perfectamente justificado para preguntarle sobre eso?
"R. Bueno, pero Ud. tiene por ejemplo ese giro de veinte y cinco mil dollars que se pagó por Riera, ¿qué garantía tenía que tener él, cuando pagaba esas cantidades tan importantes?

"P. ¿Qué quiere decir con eso?

"R. Que pagaba por cuenta de la Central y la Central tenía que garantizarle con esos bonos.

"P. ¿Entonces Ud. cita ese ejemplo como una prueba de que Riera tenía esos bonos?

"R. Tendría muchos ejemplos y si la corte me dejara explicar yo explicaría con franqueza.

"P. Lo que yo deseo saber es el título de propiedad del señor Riera.

"R. Yo no puedo llegar hasta ese extremo, habría que preguntárselo a él.

"P. ¿Ignora entonces cómo adquirió esos bonos?

"R. Yo lo que sé es que los bonos eran de él.

"P. ¿Por qué?

"R. Porque se ha presentado prueba de que al morir Riera se le adjudicaron los bonos a los menores.

"P. Me refiero al conocimiento que Ud. dice tener de los negocios de Dimas Riera.

"R. Yo no sé. Como él fué a Santo Domingo y adquirió los bonos. El caso es que se los dieron en garantía.

"P. ¿Dice Ud. que se los dieron en garantía?

"R. Esos bonos eran de la propiedad de Riera; se los dió la Central; se los dieron en garantía hipotecaria a favor de Riera.

"P. ¿Por qué se los dieron en garantía, no eran de él?

"Dte. Ese es un punto que tiene que decidir la Corte y no el testigo. En primer lugar el mismo recibo lo admite; dice—bonos como de la Sucesión Riera—y viene ahora a negar que lo que ellos recibieron no era de la sucesión . . . está 'stopped' por sus mismos actos para negar eso.

"Ddo. (P) ¿Ud. no cree señor Macías, que el señor Riera tenía esos bonos, como Presidente que era de la Boca Chica en esa época?

"R. Yo creo que no.

"P. ¿Por qué?

"R. Porque era el único que prestaba dinero a la Central y los tenía como garantía.

"P. ¿El único acreedor de la Central era Riera?

"R. La Central podría tener otros, pero el único que desembolsaba el dinero acá.

"P. No entiendo eso. ¿El señor Riera era el único que desembolsaba dinero acá?

"R. El único que prestaba a la Central dinero.

"P. ¿El único acreedor entonces?

"R. Podría tener otros allá en Santo Domingo.

"P. ¿Ud. quiere decir que el único que le prestaba dinero a la Central?

"R. Desde luego el señor Riera pagaba, como ese giro de veinte y cinco mil dollars.

"P. ¿Y el señor Fabián no le prestaba dinero a la Central?

"R. No, señor.

"P. ¿Y el señor McCormick?

"R. Tampoco, el señor McCormick lo único que hizo fué que recogió 50 bonos que quedaban en el Banco Comercial para no interrumpirla.

"P. Pero eso no tiene conexión. La pregunta es si Ud. sabe por qué el señor Dimas Riera era dueño de esos bonos.

"R. Vuelvo y le repito que no lo sé, que estaban en su poder."

Continúa el testigo declarando en relación con su intervención en las operaciones divisorias de la herencia de José D. Riera, desarrollándose finalmente el interrogatorio como sigue:

"Ddo. (P) ¿Ud. recuerda a cuánto monta esa cantidad que en esa partición de bienes se adjudicó a cargo de la Central Boca Chica?

"R. Monta a ciento seis mil pesos y centavos.

"P. ¿106,681.42?

"R. Creo que sí.

"P. ¿Quiere decir que esa era una deuda que tenía la Central Boca Chica con don José D. Riera?

"R. Sí, señor.

"P. ¿Esa deuda estaba garantizada con algunos bienes, era un crédito personal o no tenía garantía?

"R. La deuda eran los bonos hipotecarios esos.

"Juez: ¿Qué dice?

"R. La deuda eran los bonos hipotecarios.

"P. ¿Y esas son las razones por qué Ud. dice que los bonos eran de don Pepe Riera?

"R. Que los bonos eran de la propiedad de los menores.

"P. ¿Los ciento seis mil pesos y pico que le debía Boca Chica a José D. Riera, era en dinero?

"R. No sé si era en dinero; en bonos ahí están.

"Juez: ¿Cómo dice?

"Ddo. (P) ¿Los ciento seis mil y pico de pesos que le debía Boca Chica a José D. Riera, era en dinero?

"R. Yo no puedo decir si era dinero, porque como la Central disponía a cada rato de veinte y cinco mil y cincuenta mil pesos o cien mil pesos a cargo de don José D. Riera, pues le dió esos bonos en garantía.

"P. ¿Cuándo le dió esos bonos en garantía?

"R. A los menores no se los dió, se los dió a José D. Riera. Después de muerto Riera fué que yo hablé de los menores.

"P. ¿Y son ciento seis mil dólares?

"R. Eso fué lo que quedó para la partición de bienes.

"P. ¿Pero si son ciento seis mil pesos, cómo pueden ser dos cientos mil?

"Juez: Ya él dijo que el valor nominal no se puede tomar como el valor efectivo; un bono de cinco mil pesos puede haber ocasiones en que valga cinco pesos.

"P. ¿Pero Ud. nos ha dicho que él adquirió esos bonos en garantía?

"R. Yo hablé de la partición.

"Juez: Ya el testigo lo ha dicho antes; se le ha preguntado varias veces, cuál es el origen de haber adquirido don José D. Riera esos bonos y él ha dicho que no sabe.

"Ddo. Pero después ha dicho que se los dieron en garantía.

"Ddo. (P) ¿Esos bonos cómo los adquirió don José D. Riera?

"R. Vuelvo a repetirle que no lo sé.

"P. ¿De modo que si Ud. no sabe como los adquirió, cómo puede Ud. afirmar que eran de él?

"R. Son de la propiedad de José D. Riera, porque al morir él, además de haber hecho antes negocios, como lo demuestran los giros, hay ahí cartas presentadas donde tratan de los bonos, presume que eran de la propiedad del señor Riera como el señor Lamela y el señor Olegario Riera abrieron la caja y anotaron todo lo que estaba en la caja, sin esperar que un servidor viniera de Colombia.

"P. ¿Esos son los motivos?

"R. Y porque estaban en su escritorio y porque se ha descrito en la partición de bienes por el mismo Honorato Andrés.

"Juez: Esos son los motivos que Ud. tiene para decir que estos bonos pertenecían a José D. Riera?

"R. Sí, señor."

Sigue un gran número de preguntas y repreguntas sobre lo tardío de la reclamación que finalizan así:

"P. ¿Y cómo Ud. dejó pasar más de dos años, puesto que los bonos se los entregó en septiembre del veinte?

"R. Porque vuelvo y le repito que en el 21 el señor Olegario Riera dejó de ser tesorero de Boca Chica.

"P. ¿Y por qué no se los pedía Ud. a Boca Chica? ¿Ud. en representación de los menores?

' "R. Pero si el Banco Territorial los tenía para ejecutarlos.

"P. ¿En dónde? ¿En qué local estaban los bonos?

"R. Yo no sé, porque yo se los entregué al señor Frasqueri.

"**Juez:** Se los entregó Ud. en San Juan o en Santo Domingo?

"R. En San Juan.

"Ddo. (P) ¿Entonces si Ud. entregó esos bonos en 11 de septiembre al Banco Territorial y Agrícola mediante este recibo que está aquí a favor de la Sucesión de José D. Riera, si fué para hacer un canjeo por otros bonos, cómo es que Ud. admitió un recibo del Banco Territorial que dijera 'para ser enviados a nuestra agencia de Santo Domingo, como parte de la garantía colateral del préstamo agrícola de la citada agencia?'

"R. Si yo no conocía préstamo ninguno que tuviera.

"Juez: La pregunta es que si Ud. hizo objeción alguna a ese recibo, por los términos de él.

"R. No señor, porque el Banco Territorial en aquella época me prestaba confianza y como me había dicho Olegario Riera, que era para sustituirlos por otros yo tampoco dudaba en habérselos entregado al Banco sin más ni son.

"Ddo. ¿Y por qué en el recibo Ud. no exigió que dijera 'bonos pertenecientes a los menores de José D. Riera para canjearlos por otros?'

"Dte. Eso es inmaterial, porque explicación del Banco no podría perjudicar a los menores.

"Juez: La Corte la admite. La pregunta concreta, es por qué Ud. no hizo objeción a ese recibo?

"R. Ya le contesté al señor; porque tenía confianza en el Banco y como Olegario Riera me los había pedido para ser canjeados por otros."

Lleva entonces sus repreguntas la parte demandada al

extremo de si el crédito de $106,000 contra la central fué o no satisfecho y ocurre lo que sigue:

"P. ¿Ese crédito que tenía la Sucesión Riera de ciento seis mil dollars y pico se ha cobrado alguna parte de eso?

"Dte. Vamos a ver una cosa, señor; está actuando aquí la Central Boca Chica contra quién se tiene ese crédito o quién? En primer lugar no ha habido pregunta directa en cuanto a eso; en segundo lugar no es la Central Boca Chica la que está actuando; aquí no tenemos que ver con la cuenta de la Central Boca Chica.

"Juez: Que conteste el testigo.

"R. Después de muerto Riera, la Central Boca Chica siguió girando a cargo de la Sucesión de José D. Riera, y se le seguía pagando, de manera que si fuéramos a ver, en el crédito de ciento seis mil pesos tendríamos que cargarle muchísimas más cantidades que giró.

"P. ¿Qué cantidad giró?

"R. No puedo decirle.

"P. ¿Giró cincuenta mil pesos?

"R. No puedo decirle; yo tengo cartas aquí de noventa mil pesos.

"P. ¿Por qué concepto?

"R. Para pagar sus cuentas.

"P. ¿Pero seguía girando la Central Boca Chica?

"R. Boca Chica, Tesorero Olegario Riera. Si vamos a llevar la cuenta a ese extremo tendría que traer todos los giros después de muerto Riera.

"P. ¿Con qué dinero se pagaron esos giros?

"R. Con dinero de la Vda. de Riera.

"P. ¿No dinero de los menores?

"R. No sé; ya estaban repartidos los bienes, yo pagué.

"P. ¿Ud. pagó como apoderado de la Vda. de Riera?

"R. La cuenta en el National City Bank permanece a nombre de 'Sucesión de José D. Riera'.

"P. ¿Quiere decir que la Sucesión de José D. Riera, seguía pagando?

"R. Sí, pero no era la sucesión.

"P. ¿Y no teniendo la Central Boca Chica, dinero en su poder, por qué Uds. pagaban esos giros?

"R. Porque como le dije antes éramos accionistas y habíamos sido siempre los que le dábamos dinero, José D. Riera. Aquí hay

cartas del Presidente, donde dice: 'que espera de un momento a otro ventas de azúcares para pagar.'

"P. ¿De qué fecha es esa carta?

"R. Agosto de 1921, Miguel Guerra Parra, Presidente Central Boca Chica.

"P. ¿Hasta qué fecha estuvieron pagando?

"R. Tampoco recuerdo.

"P. ¿Cómo en qué fecha? ¿En el año 21?

"R. Sí, cuando votaron a Olegario Riera.

"P. ¿De modo que hasta el 21 estuvieron Uds. pagando giros de Boca Chica?

"R. No sé si fué hasta el 21.

"P. ¿Pero dígame hasta qué fecha?

"R. No le puedo decir.

"P. ¿Sería en diciembre del 20?

"R. Bueno, aquí no estamos con la cuenta de la Central Boca Chica.

"P. ¿Sería en diciembre del 20?

"R. No lo recuerdo.

"P. ¿Cómo es que teniendo pendiente de cobro el crédito de ciento seis mil y pico de dollars, cómo es que Uds. seguían pagando dinero a Boca Chica?

"R. Pagando no . . .

"P. ¿No siguieron Uds. hasta entonces pagando?

"R. Porque éramos accionistas.

"P. ¿Estaban los accionistas obligados a pagar, por el hecho de ser accionistas?

"R. Porque como teníamos los bonos y no creíamos que nos fueran a dar el carpetazo.

"P. ¿Siguieron pagando con dinero de la Sucesión?

"R. De mi hermana.

"P. ¿Pero la cuenta en el Banco, era Sucesión de José D. Riera?

"R. Sí, pero eso no quiere decir . . ."

Terminada la prueba de la parte demandante, la parte demandada pidió que se le permitiera presentar las declaraciones de Olegario Riera y Honorato Andrés, pero como ello envolvía una posposición de la vista, pues dichos testigos residían en España, y ambas partes habían anunciado al comenzar el juicio que se encontraban listas, la corte negó el permiso y declaró el caso concluso para sentencia, que dictó

el 27 de junio de 1928 condenando a los demandados solidariamente a devolver a los demandantes los cuatrocientos bonos de que se trata y si ello no fuere posible a pagarles la suma de doscientos mil dólares, valor de los bonos, con intereses legales desde la interposición de la demanda, con costas, gastos y honorarios de abogado.

La corte de distrito basó su sentencia en una relación del caso y opinión que contiene la siguiente declaración de hechos probados:

"Que al llevarse a cabo las operaciones de liquidación, división y adjudicación de la herencia de don José Dimas Riera y Cifuentes, que se protocolizaron, previa aprobación judicial, en tres de agosto de 1920, ante el Notario don José Ramírez Santibáñez, se adjudicó a los ahora demandantes, un crédito por CIENTO SEIS MIL SEISCIENTOS OCHENTA Y UN DOLLARS y cuarenta y dos centavos en iguales partes, y en común proindiviso contra la Central Bocachica de Santo Domingo, en bonos hipotecarios garantizados con toda la propiedad inmueble y sus accesorios en la misma, pertenecientes a dicha entidad Central Bocachica, domiciliada en Andrés Común de Guerra, Provincia de Santo Domingo, República Dominicana. Y que en ese concepto se les dieron para los demandantes, por virtud de la referida adjudicación, cuatrocientos bonos hipotecarios de la mencionada Central Bocachica, de valor a la par de quinientos dollars cada uno, y que tales bonos fueron recibidos por la representación de los ahora demandantes, y estaban en poder de sus dueños, o sea, de los referidos demandantes.

"Aparece probado por la misma escritura de partición de herencia antes mencionada (Exhibit L de los demandantes), que en las referidas operaciones de inventario, liquidación y adjudicación de bienes de la herencia de don José Dimas Riera Cifuentes, y por razón de ser todos los ahora demandantes, menores de edad, y tener intereses encontrados con su madre, representó a los demandantes como defensor judicial nombrado por esta Corte de Distrito de San Juan, el demandado en este pleito, Olegario Riera y Cifuentes, quien firmó ante Notario dicha partición de bienes como tal defensor judicial de los menores, y por consiguiente, tuvo completo y cabal conocimiento de las adjudicaciones que a los ahora demandantes se hicieron en dicha partición, y entre ellas tuvo conocimiento de que a los menores demandantes se les habían adjudicado

en dicha partición, los bonos al portador antes mencionados. De modo que, aparece como un hecho probado, fuera de toda duda, que el demandado Olegario Riera y Cifuentes sabía que los referidos bonos al portador reclamados en esta demanda, eran de la única y exclusiva propiedad de los menores ahora demandantes, y no de ninguna otra persona.

"Según aparece de la certificación expedida por el Secretario de la Cámara Civil y Comercial del Juzgado de Primera Instancia del Distrito Judicial de Santo Domingo, República Dominicana, que es el Exhibit S de los demandantes, se siguió ante dicho juzgado de Primera Instancia de Santo Domingo, un procedimiento para la venta y adjudicación de la factoría de moler caña de azúcar, denominada 'Central Bocachica', con todos sus accesorios y dependencias, a requerimiento, persecución y diligencia del Banco Territorial y Agrícola de Puerto Rico.

"En el cuaderno de cláusulas y condiciones depositado para la subasta, y que constan en la certificación antes mencionada, se hace constar lo siguiente bajo el título 'Enunciaciones preliminares': ·

"En virtud de una obligación hipotecaria consentida por la compañía Anónima o por acciones Central Bocachica, domiciliada en Andrés Común de Guerra, provincia de Santo Domingo, instrumentada por el Notario Público don Armando Pellerano Castro, con fecha 9 de septiembre de 1919, debidamente registrada e inscrita en los Registros de la Conservaduría de hipoteca y otorgada a nombre del Banco Territorial y Agrícola de Puerto Rico, corporación bancaria domiciliada en la Ciudad de Santo Domingo, República Dominicana, para seguridad de pago de los bonos al portador, emitidos por la Compañía Central Boca Chica en fecha 1º. de septiembre del año 1919, en números del 1 al 700, por valor de quinientos pesos, oro cada uno, suscrito dichos bonos por el Sr. Miguel Parra Alba, Vice-Presidente, y el Sr. Olegario Riera, Tesorero de la Compañía Anónima Central Boca Chica, etc.'

"En la misma certificación (Exhibit L), aparece lo siguiente: 'Que dicha ejecución se llevó a cabo, a requerimiento del Banco Territorial y Agrícola de Puerto Rico, obrando por sí, como tenedor de 600 de los citados bonos al portador, y en su calidad de trustee, por los bonos del No. 600 al 700, o sea, por los restantes cien bonos, cuyo valor total de los bonos es de cuatrocientos siete mil cuatrocientos ochenta y ocho pesos, oro americano, con cuarenta y seis centavos, importe del capital e intereses vencidos.'

"De la misma certificación (Exhibit L), aparece que la subasta

fué adjudicada por la suma de Doscientos Cincuenta Mil Diez Dollars, oro americano, a la Compañía Andrés Sugar Co., Compañía por acciones; y que en virtud de dicha adjudicación pasó a poder de la adjudicataria, la factoría' de moler cañas, denominada 'Central Boca Chica' con todas sus instalaciones, casa de caldera, maquinaria, líneas férreas y telefónicas, casa de vivienda y para oficinas, accesorios y dependencias y todo lo que sirve para la explotación de dicha Central. (Hechos probados.)

"Según aparece de la declaración de Antonio B. Macías, resulta probado lo siguiente:

" 'Que el Sr. Antonio B. Macías estuvo trabajando con su cuñado don José Dimas Riera, alrededor de catorce años, y que intervenía en todos los negocios de Riera hasta la muerte de éste, que ocurrió en 6 de mayo de 1920; que después de la muerte de José Dimas Riera, la esposa de éste le hizo un poder al testigo. Que el demandado Olegario Rivera era hermano del fallecido don José Dimás Riera; que don Rafael Fabián le pidió a la viuda de Riera la llave de la oficina de su esposo fallecido; que encontraron en dicha oficina 400 bonos hipotecarios de la Central Boca Chica, de Santo Domingo, con un valor a la par de Quinientos Dollars cada bono. Que esos bonos los había visto el testigo con anterioridad, en poder de José Dimas Riera; que tales bonos no tenían nada que ver con el Banco Territorial y Agrícola de Puerto Rico, y que no tenían tampoco ninguna nota de estar pignorados. Que el demandado Olegario Riera, por medio de una carta, le dió al testigo ciertas instrucciones, y que después, Olegario Riera personalmente, le dijo al testigo; 'que entregara los bonos al Banco Territorial y Agrícola de Puerto Rico, para sustituirlos por otra emisión.' Que la Sucesión Riera no tenía ninguna operación de préstamo entonces, con el Banco Territorial y Agrícola; que el día 11 de septiembre de 1920, el testigo Antonio B. Macías entregó personalmente al señor Frasqueri (Tesorero del Banco Territorial y Agrícola de Puerto Rico) los referidos bonos mediante el recibo (Exhibit M del demandante), que copiado literalmente lee como sigue:

" 'Núm. 8675.—Por $_____. Banco Territorial y Agrícola de Puerto Rico.—Hemos recibido de Sucesión de José D. Riera la cantidad de Cuatrocientos Bonos de Quinientos dollars cada uno de la Cent. Boca Chica, para ser enviados a n/ Ag. Sto. Domingo como parte de la garantía colateral del Préstamo Agrícola con la citada Agencia.—San Juan, Puerto Rico, 11 de sept. 1920.—(Fdo) A. Frasqueri.—El Cajero.'

" 'Declaró además, el testigo Macías, que no se pidió ninguna autorización judicial para hacer la entrega de los bonos.' Que no le han devuelto a la Sucesión los bonos, ni los sustitutos de los bonos, ni el importe de los bonos; y que el Banco Territorial y Agrícola de Puerto Rico, con esos bonos, ejecutó la Central Boca Chica, de Santo Domingo. (Hechos probados.)

"De la certificación de acuerdos del Consejo de Administración del Banco Territorial y Agrícola de Puerto Rico, presentada en evidencia (Exhibit T de los demandantes), no aparece en ninguna forma que se haya hecho negociación de ninguna especie entre el Banco Territorial y Agrícola y la Sucesión de José Dimas Riera, en virtud de la cual dicha Sucesión se haya podido comprometer a entregar sus bonos hipotecarios como garantía de ninguna operación agrícola, o de algún préstamo de cualquier clase. Sin embargo, aparece probado que el Banco Territorial y Agrícola de Puerto Rico recibió los cuatrocientos (400) pertenecientes a la Sucesión de José Dimas Riera, y que el referido banco, como tenedor de los mencionados bonos, ejecutó en los Tribunales de Santo Domingo, la Central 'Boca Chica', aprovechándose de dichos bonos en su propio beneficio.

"Aparece probado, que el Banco Territorial y Agrícola dispuso de los referidos cuatrocientos bonos, sin el consentimiento o anuencia de los demandantes o de su representante legal, (pues no se ha probado en manera alguna, que Antonio B. Macías fuera representante legal de dichos menores demandantes), y sin que para disponer de dichos bonos, hubiera mediado autorización judicial alguna, u orden de algún Tribunal competente.

"Está probado, que los cuatrocientos bonos, eran bonos al portador, y· el acto de desprenderse de un bono al portador y entregarlo a otra persona, equivale prácticamente a una enajenación de dichos bonos.

"La única persona que pudo legalmente entregar dichos bonos al Banco Territorial y Agrícola de Puerto Rico, fué doña Josefa Bengoechea y Macías, quien era entonces (el día 11 de septiembre de 1920), la madre con patria potestad de dichos menores; pero para que ella hubiera podido legalmente desprenderse de dichos bonos y entregarlos al Banco Territorial y Agrícola de Puerto Rico, personalmente o por conducto de su apoderado Antonio B. Macías, era absolutamente indispensable que se hubiese obtenido la correspondiente autorización judicial de la Corte de Distrito competente, previa comprobación de la necesidad o utilidad de la enajenación, de

acuerdo con lo dispuesto terminantemente en el artículo 229 del Código Civil.

"El demandado, Banco Territorial y Agrícola de Puerto Rico no pudo ignorar que don José Dimas Riera y Cifuentes había fallecido con anterioridad al recibo del Banco de los cuatrocientos bonos al portador. Y declaramos que no podía ignorar este hecho, porque la muerte del señor José Dimas Riera ocurrió en un accidente de automóvil en la Isla 'de Puerto Rico, y especialmente, porque según aparece de la certificación de acuerdos del Consejo de Administración del Banco Territorial y Agrícola de Puerto Rico (Exhibit T de l'os demandantes), dicho señor José Dimas Riera era uno de los Consejeros del Banco Territorial y Agrícola de Puerto Rico, y asistía a las sesiones de ·dicho Banco en tal carácter de consejero, según aparece de las actas de las sesiones celebradas por el Consejo de Administración del Banco demandado, celebradas en 12 de juli'o de 1919, 14 de julio de 1919 y 24 de septiembre de 1919.

"En las sesiones del Consejo de Administración del Banco demandado celebradas el día 9 de agosto de 1920, y el día 30 de agosto de 1920, cuyas actas tenemos a la vista, se n'ota la ausencia del consejero del Banco, Sr. José Dimas Riera, porque con anterioridad a esas fechas ya él había fallecido.

"Resulta probado, sin ningún género de duda que los referid'os cuatrocientos bonos hipotecarios al portador, de la Central Boca ·Chica, pasaron del poder de l'os demandantes, a poder del Banco Territorial y Agrícola de Puerto Rico; que el referido Banco se apropió de ellos sin que haya mediado nunca, enajenación de ninguna clase por parte de los demandantes, a favor de dicho banc'o Territorial y Agrícola; que el Banco utilizó dichos bonos en su propio beneficio para ejecutar la Central Boca Chica, de Santo Domingo, y que dichos bonos no han sido devueltos a los demandantes, ni por el Banco Territorial y Agrícola, ni por el otro demandado Olegario Riera y Cifuentes, habiendo sido los demandantes despojados de los referidos bonos hipotecari'os.

"No aparece probado en ninguna forma, que los demandantes autorizaran la entrega de tales bonos, c'omo garantía colateral de una deuda de la Central Boca Chica, para con el Banco Territorial y Agrícola, ni para garantizar deudas que le eran extrañas a dichos menores, ni que los demandantes se constituyeran nunca en fiadores del demandado Olegari'o Riera y Cifuentes, o de la Central Boca Chica para con el referido Banco Territorial y Agrícola de Puerto Rico.

"Se ha probado, que ninguno de los demandados ha restituído a los demandantes, los 400 bonos al portador que fueron entregados al Banco Territorial y Agrícola de Puerto Rico.

"Se ha probado que a los menores no se les ha entregado, por ninguno de los demandados, bonos sustitutos de los 400 bonos entregados al Banco Territorial, y que tampoco se les ha entregado, por ninguno de los demandados, el importe de dichos bonos, que tenían un valor de $500.00 cada bono.

"Se ha probado que el demandado Olegario Riera y Cifuentes era Tesorero de la Central Boca Chica el día 11 de septiembre de 1920, y después de esa fecha."

Contra la sentencia de 27 de junio, 1928, apelaron los demandados el 26 de julio siguiente. Antes, el 9 de julio, radicaron un aviso de intención de solicitud de nuevo juicio, siendo presentadas las mociones el 27 de agosto siguiente.

Las mociones solicitando el nuevo juicio se basan: 1, en accidente o sorpresa que la ordinaria prudencia no pudo prevenir; 2, en evidencia nuevamente descubierta; 3, en insuficiencia de la prueba para sostener la sentencia; 4 en errores cometidos durante la práctica de las pruebas.

Ya nos hemos referido al permiso que solicitó la parte demandada, al terminar de practicar su prueba la parte demandante, para presentar los testimonios de Olegario Riera y Honorato Andrés, y a la negativa de la corte. Se insiste en la moción de nuevo juicio, apoyándose en declaraciones juradas, en que los demandados descansaban en el recibo que el banco otorgó al entregársele los bonos y en que lo dicho por el testigo Macías en contrario de lo que el recibo expresa, constituyó para los demandados una sorpresa que no les fué posible prevenir.

Con respecto a la nueva prueba descubierta las mociones de nuevo juicio son explícitas. Tomaremos como base una de ellas. Prácticamente son iguales. Copia de la demanda y continúa:

"Por consiguiente, la alegación fundamental para sostener la causa de acción de los demandantes consiste en ser dueños de los

cuatrocientos bonos hipotecarios de CENTRAL BOCA CHICA, consistiendo el título de su propiedad en la adjudicación de un crédito que tenían los demandantes a la fecha de escriturarse las operaciones testamentarias de su causante D. José D. Riera en la suma de CIENTO SEIS MIL SEISCIENTOS OCHENTA Y UN DOLLARS y 42 centavos.

"La incongruencia de esta alegación fué debidamente consignada por las excepciones previas de los demandados.

"Ahora bien, a pesar de los esfuerzos y diligencias de los demandados no les fué posible conseguir con anterioridad al juicio, pruebas suficientes de los siguientes hechos, cuya existencia ignoraban los demandados antes del acto de la vista:

"(1) Que el crédito adjudicado a los demandantes en la escritura de partición y adjudicación de los bienes de D. José D. Riera, como una deuda proveniente de Central Boca Chica para con José D. Riera fué pagado por dicha Central después de la muerte de Riera y antes de la interposición de la demandada por los demandantes.

"(2) Que los demandantes nunca estimaron que los bonos hipotecarios a que se refiere la demanda fueran de su propiedad, por cuanto aun después de la supuesta adjudicación continuaron gestionando el cobro del crédito, y lo realizaron, a pesar de tener LA POSESIÓN de los bonos referidos.

"(3) Que los bonos hipotecarios de Central Boca Chica, nunca fueron enajenados por la Central, lo cual conocían los demandantes a la fecha de la interposición de la demanda por ser accionistas de Boca Chica.

"La prueba de estos hechos hubiera causado una decisión distinta en el caso, por cuanto habiendo sido pagado el crédito contra Boca Chica, a los demandantes éstos carecían de derecho alguno sobre los bonos, aun en el supuesto que dichos bonos hubieran sido dados en garantía colateral del crédito, como afirmó el testigo Macías en su declaración.

"Después del juicio, y en forma y manera como consta en los affidavits de méritos que sostienen esta parte de la moción, los demandados han encontrado prueba escrita indubitada de los siguientes hechos:

"1. Que los bonos hipotecarios reclamados en la demanda siempre fueron propiedad de la Central Boca Chica, nunca fueron enajenados por ésta, ni a favor de los demandantes, ni de ninguna otra persona.

"2. Que el crédito de ciento seis mil seiscientos ochenta y un dollars y 42 centavos que se adjudicó a los demandantes contra la Central Boca Chica fué pagado por la Central.

"3. Que los demandados nunca consideraron que les fuera hecha adjudicación alguna de los bonos en pago del crédito, porque después de la fecha de la escritura de partición y adjudicación continuaron gestionando el cobro y cobraron el crédito, sin considerarse nunca pagados del mismo con la adjudicación de los bonos.

"Esta nueva evidencia se relaciona y detalla en los correspondientes affidavits de méritos y es por sí sola suficiente para determinar una decisión en este pleito completamente distinta a la rendida antes del descubrimiento de estas pruebas."

Y argumentando este extremo, dicen los demandados-apelantes en su alegato:

"La primera declaración jurada es la de Aureo B. García, quien establece cuatro puntos de suma importancia, a saber:

"(a) Que los bonos de la Central Bocachica, entre ellos los que alega la demandante que le pertenecen, siempre fueron propiedad de dicha Central, sin que nunca los transfiriera a terceras personas.

"(b) Que los bonos de Central Bocachica que estuvieron en poder de José D. Riera fueron usados para garantizar los créditos refaccionarios hechos al Banco Comercial de Puerto Rico y al Banco Territorial y Agrícola.

"(c) Que los 400 bonos que estaban en poder de don José D. Riera a su muerte le habían sido entregados como garantía para que efectuara un préstamo de doscientos mil dólares en el Banco Territorial y Agrícola, con el fin de pagarse a sí mismo de doscientos mil que la Central Bocachica le debía.

"(d) Que la Central Bocachica a la muerte de don José D. Riera le debía una suma que alcanzaba alrededor de ciento seis mil seiscientos ochentiún dólares y cuarentiún centavos.

"Esta declaración e informe fué sometido a los contables públicos Stagg, Mather & Hough, cuyo informe también obra en autos; y confirma en todas sus partes las declaraciones de Arias y García.

"Durante el juicio oral se presentó la escritura de división y adjudicación del caudal hereditario de don José D. Riera; y en dicho documento aparece adjudicada a parte de la Sucesión este crédito de la Central Bocachica. La adjudicación tenía que referirse necesariamente a este crédito y no a otro, porque los libros demuestran que solamente era éste el crédito en existencia a la muerte del señor

Riera. Los mismos demandantes no pretenden que existiera otro crédito contra Central Bocachica que el adjudicado.

"Ahora bien, la declaración del señor García, confirmada por el informe de los señores Stagg, Mather & Hough y por los libros de la compañía, cuyas copias se han producido con la moción de acuerdo con la ley por medio de declaraciones juradas, demuestra que, a la muerte del señor Riera y después de la adjudicación del crédito las relaciones entre Central Bocachica y los herederos del señor Riera no fueron interrumpidas, sino que continuaron como en vida de este último. En otras palabras, el crédito adjudicado no constituyó una liquidación final, sino que sirvió de base únicamente para que la Sucesión Riera, hoy demandante en este caso, continuara en sus transacciones con la Central Bocachica.

"No hay que alegar, cualquiera que sea la forma en que está redactada la escritura de partición, que si el crédito adjudicado fué pagado, la sucesión Riera no tenía interés, en equidad o en derecho, sobre los bonos hipotecarios entregados al Banco Territorial y Agrícola. Eso salta plenamente a la vista.

"Pero la declaración del señor García con la prueba a ella anexa, demuestra que después de la adjudicación del crédito la Sucesión Riera recibió de la Central Boca Chica a cuenta de ese crédito importantes cantidades de dinero.

"Una de dos, o los bonos hipotecarios fueron adjudicados en pago del crédito y tuvieron el efecto de extinguir la obligación, en cuyo caso la Central Bocachica no estaba obligada a satisfacerlo y estos pagos no tienen explicación de clase alguna; o la adjudicación del crédito, con referencia a los bonos, no transfirió a la sucesión Riera la propiedad de los mismos, y cualquiera que fuera el interés de la sucesión Riera en los bonos, éste quedó extinto por virtud del pago del crédito.

"Pero hay más aún, en prueba descubierta por el Banco Territorial y Agrícola después de la presentada juntamente con la moción de nuevo juicio, y que ha sido objeto de una declaración jurada suplementaria por parte del señor Coll Cuchí, uno de los abogados de los demandados, resulta que el demandado Olegario Riera pagó a la sucesión Riera la parte restante del crédito que aparece no pagada en los libros de Central Bocachica; y que fué el mismo Antonio Macías en su carácter de apoderado de la Sucesión Riera, quien firmó la carta de pago, reconociendo que a aquella fecha no existían más obligaciones que liquidar entre el demandado Olegario Riera y la sucesión demandante."

El alegato de la parte apelada en el recurso No. 5038, nuevo juicio, revela uno de los esfuerzos mayores que hemos visto realizar en casos de esta naturaleza. Contiene doscientas sesenta y una páginas y cada cita que en él se hace se advierte que ha sido comprobada y relacionada con los hechos envueltos. No hay observación de los apelantes que no haya sido contestada, explicada o rebatida en todos sus aspectos. Bien pudiera decirse que se ha agotado en él la jurisprudencia relativa a la forma en que deben solicitarse los nuevos juicios y a los casos en que deben concederse o negarse.

Si la moción de nuevo juicio se basara únicamente en los dos primeros motivos, nos veríamos obligados quizá, técnicamente, a declararla sin lugar, porque los apelantes, dadas las alegaciones que la demanda contiene, debieron ir mejor preparados a la vista, siendo muy dudoso que pueda considerarse como una verdadera sorpresa que la ordinaria prudencia no pudo prever la declaración de Macías, y porque si hubieran ejercitado la debida diligencia, es muy probable que hubieran podido encontrar a tiempo la nueva prueba descubierta.

Pero la moción se basa en un tercer motivo, el de la insuficiencia de la prueba, que da color y vida y fuerza a los dos primeros de tal suerte que a nuestro juicio se impone la devolución del pleito a la corte de su origen para dar a las partes una nueva oportunidad de esclarecer sus respectivas posiciones y permitir a la corte dictar a plena conciencia el fallo que en justicia proceda.

Aun a riesgo de extender esta opinión demasiado, expusimos toda la evidencia aportada por los demandantes y transcribimos los hechos declarados probados por el tribunal sentenciador. No hay duda alguna que los cuatrocientos bonos de que se trata estaban en la oficina de José D. Riera, cuando éste inesperadamente perdió la vida en un accidente de automóvil. Tampoco la hay de que fueron entregados al Banco Territorial. A virtud de qué y para qué se entregaron,

lo declara probado la corte de distrito basándose únicamente en la declaración de Macías, cuya lectura, en verdad, produjo en nuestra mente y en nuestra conciencia ese efecto de incertidumbre, de malestar, que impide que lleguemos a juicios definitivos, firmes y claros. Y para dar ese entero crédito a la declaración de Macías, tuvo la corte que prescindir enteramente también de lo hecho constar por escrito, en el momento mismo de la entrega de los bonos, por el banco, en el recibo entregado al propio Macías, hombre de negocios, apoderado en vida de Riera y a la muerte de éste de su viuda y representante de su Sucesión cuyos cuantiosos intereses y variadas actividades surgen de los autos. El propio Macías no explica, no obstante su completo conocimiento de los asuntos de Riera, cómo se convirtió éste en dueño de los bonos, y en varios pasajes de su declaración dice que los bonos fueron dados en garantía.

Cuando se termina de leer y estudiar la prueba de los demandantes, el juzgador, como por impulso natural, pide luz, más luz, para poder formar su juicio. No se siente convencido ni para desestimar de plano la reclamación de los menores demandantes, ni para concluir que dichos menores eran los dueños de los cuatrocientos bonos hipotecarios de que se trata y fueron de ellos despojados fraudulentamente por el demandado Olegario Riera actuando en combinación con el otro demandado Banco Territorial y Agrícola de Puerto Rico. Y en ese estado de ánimo, la petición de nuevo juicio para presentar nuevas pruebas de la naturaleza de las que en ella se especifican, capaces, de ser ciertas, de variar en su totalidad o en parte la sentencia pronunciada, produce una impresión de descanso y se presenta como la verdadera línea de conducta a seguir tan clara y justamente, que el no seguirla implica que no se hizo por el juez sentenciador el debido ejercicio de la facultad discrecional de que estaba investido para reabrir el caso y ordenar la celebración de un nuevo juicio.

No nos detendremos a exponer la ley y la jurisprudencia aplicables. Esta corte, en repetidos casos, que se citan por ambas partes, ha tenido oportunidad de ahondar en la materia.

Hubiéramos analizado más detalladamente la prueba a no temer que al así hacerlo, poniendo de relieve todas las peculiares circunstancias que hemos podido observar, quedara el caso prejuzgado, cuando nuestra resolución no va tan lejos como decidir que a los demandantes no les asista la razón para reclamar todo o parte de lo que reclaman, estando por el contrario limitada a la concesión de un nuevo juicio que, según el propio legislador, consiste en "la revisión de una cuestión de hecho ante la corte o árbitro que celebró el (*juicio*) anterior en que se suscitó aquélla y pronunció sentencia." Art. 220 del Código de Enj. Civil. Nada, pues, de lo que nos hayamos visto obligados a expresar en esta opinión en relación con la prueba, debe influir en el criterio del juez de la corte de distrito de San Juan ante quien se celebre el nuevo juicio. En la prueba que en el nuevo juicio se practique y únicamente en ella es que debe basarse el nuevo fallo que se dicte.

Por virtud de todo lo expuesto, los recursos deben resolverse *revocando la resolución apelada de 29 de junio de 1929 por virtud de la cual se negó la concesión del nuevo juicio; concediendo el nuevo juicio solicitado, y, en su consecuencia, anulando la sentencia apelada de junio 27, 1928, devolviéndose el caso a la corte de distrito de su origen para que continúe conociendo del mismo de acuerdo con la ley.*

El Juez Asociado Señor Texidor no intervino.